Filed 4/16/14 (unmodified version attached)

# IN THE SUPREME COURT OF CALIFORNIA

JOSEPH E. HOLLAND, as Assessor, etc., )
                                        )
         Plaintiff and Appellant, )
                                        )                 S205876
     v. )
                                        )       Ct.App. 2/6 B229656
ASSESSMENT APPEALS BOARD NO. 1, )
                                         )
         Defendant and Respondent; )      Santa Barbara County
                                         )    Super. Ct. No. 01244457
RANCHO GOLETA LAKESIDE )
MOBILEERS, INC., et al., )
                                         )
         Real Parties in Interest and )
         Respondents. )
_____)

## ORDER MODIFYING OPINION AND
## DENYING PETITION FOR REHEARING

THE COURT:

The opinion herein, filed January 23, 2014, appearing at 58 Cal.4th 482, is modified as follows:

On page 487, of the majority opinion, in the first paragraph, following the phrase "In this case, the Assessor for the County of Santa Barbara (Assessor) reassessed," insert the following phrase after the word "reassessed" and before the word "two:" "26 subsequent transfers of individual interests in." In the same sentence, delete the word "owned" and substitute the word "held." The new sentence should read as follows: "In this case, the Assessor for the County of

Santa Barbara (Assessor) reassessed 26 subsequent transfers of individual interests in two mobilehome parks held by resident-controlled nonprofit corporations after certain residents sold both their mobilehomes and their interests in the corporation."

This modification does not affect the judgment.

The petition for rehearing is denied.

Filed 1/23/14 (Unmodified version)

# IN THE SUPREME COURT OF CALIFORNIA

JOSEPH E. HOLLAND, as Assessor, etc., )
)
        Plaintiff and Appellant, )
)                S205876
v. )
)     Ct.App. 2/6 B229656
ASSESSMENT APPEALS BOARD NO. 1, )
)
        Defendant and Respondent; )    Santa Barbara County
)    Super. Ct. No. 01244457
RANCHO GOLETA LAKESIDE )
MOBILEERS, INC., et al., )
)
        Real Parties in Interest and )
        Respondents. )
_____)

In 1978, California voters adopted Proposition 13, which added article XIII A to our state Constitution. This amendment limited the rate at which real property in this state may be taxed and the extent to which the assessed value of real property may be increased. As relevant here, real property may be taxed at no more than 1 percent of its "full cash value," with "full cash value" defined to mean either the assessed value of that property in the 1975–1976 tax year or the property's value at the time of a subsequent "change in ownership," subject to an adjustment for inflation. (Cal. Const., art. XIII A, §§ 1, subd. (a), 2, subds. (a) & (b).) Thus, real property generally is taxed based on its value at the time of acquisition, not its current value. The task of defining when there has been a change in ownership that triggers reassessment has been left largely to the

1

Legislature.  (*Pacific Southwest Realty Company v. County of Los Angeles* (1991) 1 Cal.4th 155, 160–161.)

This case concerns the assessment of certain types of mobilehome parks. Mobilehome parks in California may be organized in a number of ways.  In 1985, the Legislature passed a statute intended to encourage one particular form of organization.  Pursuant to what is now Revenue and Taxation Code section 62.1, subdivision (a)(1), a "transfer . . . of a mobilehome park to a nonprofit corporation, stock cooperative corporation, limited equity stock cooperative, or other entity formed by the tenants of a mobilehome park, for the purpose of purchasing the mobilehome park" is deemed not to be a change in ownership of the park.  (All undesignated statutory references are to the Revenue and Taxation Code.)  Thus, section 62.1, subdivision (a)(1) allows the residents of a mobilehome park to form a nonprofit corporation or similar entity to take ownership of the park without triggering reassessment.

Subsequently, in 1988, the Legislature introduced Senate Bill No. 1885 (1987–1988 Reg. Sess.) in part to address a problem in the tax treatment of mobilehome parks that emerged under section 62.1.  Transfers of interests in mobilehome parks held by a nonprofit corporation, unlike those held by a condominium or stock cooperative, did not constitute a change in ownership under the Revenue and Taxation Code.  (See §§ 61, 65.1.)  Therefore, once a mobilehome park was purchased by a nonprofit corporation or similar entity, subsequent transfers of membership shares were not subject to reassessment.  As explained in an analysis of Senate Bill No. 1885 prepared by the State Board of Equalization (SBE), "[p]utting a park into a nonprofit mutual benefit corporation ownership could mean that no part of the park would ever be reappraised again, since transfers of individual interests in a nonprofit corporation do not trigger reappraisal.  This would give mobilehome parks much more favorable treatment

2

than the average homeowner." (SBE, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Mar. 24, 1988, p. 2.)

In amending section 62.1, the Legislature crafted a rule to facilitate what it viewed as equitable tax treatment of these property interests: Where a mobilehome park has been purchased by a nonprofit corporation or similar entity, any subsequent transfers "of shares of the voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . shall be a change in ownership of a pro rata portion of the real property of the park . . . ." (§ 62.1, subd. (b)(1).) The Legislature defined the term " 'pro rata portion of the real property' " as "the total real property of the mobilehome park multiplied by a fraction consisting of the number of shares of voting stock, or other ownership or membership interests, transferred divided by the total number of outstanding issued or unissued shares of voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . ." (§ 62.1, subd. (b)(2).) Thus, no change of ownership occurs when the residents of a mobilehome park form a nonprofit corporation or similar entity that purchases the park. But if one of the residents subsequently transfers his or her interest in the entity that owns the park, that transfer will constitute a change in ownership of a "pro rata portion" of the park.

In this case, the Assessor for the County of Santa Barbara (Assessor) reassessed two mobilehome parks owned by resident-controlled nonprofit corporations after certain residents sold both their mobilehomes and their interests in the corporation. The mobilehomes themselves, which are classified as personal property, were assessed separately. (§§ 5801, 5810.) Following the guidance of the SBE, the Assessor appraised the real property interest subject to reassessment — i.e., a fraction of the mobilehome park itself — by subtracting the estimated market value of the mobilehome from the total price paid for both the mobilehome

3

and the membership interest in the corporation owning the park. We are asked to determine whether section 62.1, subdivision (b) (hereafter section 62.1(b))—which states that a transfer of a membership in an entity that owns a mobilehome park is a "change of ownership of a pro rata portion of the real property of the park" — requires an assessor to instead appraise such an interest by first estimating the value of the entire park and then multiplying that value by the fractional interest in the park that was transferred. We conclude that it does not. Section 62.1(b) simply describes a unit of real property that is subject to reassessment; it does not mandate any particular formula for appraising this unit. Accordingly, we reverse the judgment of the Court of Appeal, which affirmed the denial of the Assessor's petition for a writ of mandate.

## I.

Rancho Goleta Mobilehome Park (Rancho Goleta) was purchased in 1992 for $9.4 million by Rancho Goleta Lakeside Mobileers, Inc., a nonprofit corporation whose members are residents of the park. Silver Sands Village Mobilehome Park (Silver Sands) was similarly purchased by a nonprofit corporation formed by park residents, Silver Sands Inc., for $1.5 million in 1998. All of the residents in these parks — including both those residents who hold interests in the corporations that own the parks and the handful of residents who do not — entered into a lease with the corporation that entitles each resident to a specific mobilehome space. During the 2001 calendar year, a total of 26 members of these two corporations sold both their membership interests and their mobilehomes to incoming residents of the parks.

In 1999, the SBE issueD an advisory letter to county assessors that described how mobilehome parks should be assessed following such transfers of individual interests in resident-owned mobilehome parks. (Letter No. 99/87, Individual Transfers in Resident-Owned Mobilehome Parks (Dec. 31, 1999) (LTA

4

No. 99/98).) LTA No. 99/87 explained that such a sale "conveys to its holder in substance: (1) the outright ownership of a particular mobilehome, and (2) the exclusive right to occupy a particular space within the park." (*Id.* at p. 3.) The letter observed that the phrase "pro rata portion of the real property" in section 62.1(b) is "the fractional interest in the park that is conveyed by the transferred share of stock." (*Ibid.*) It also observed that the "appraisal unit" to be considered in calculating the fair market value of this interest is "the individual mobilehome space and the mobilehome," as "it is clear that what persons in the marketplace commonly buy and sell as a unit is not the entire park, but rather the fractional interests conveyed by the individual interests." (*Id.* at p. 4; see § 51, subd. (d) [defining appraisal unit]; 18 Cal. Code Regs., § 324, subd. (b).) Thus, "if the reported purchase price was negotiated in the open market at arm's length, then it is our view that the entire amount should be reflected in the combined assessments of the mobilehome and the underlying interest in the park." (LTA No. 99/87, at p. 3.) LTA No. 99/87 concluded that the "most reasonable way of allocating the value" between the mobilehome and the underlying fractional interest in the park was to employ what has been termed the extraction method: "(1) extract from the reported purchase price the value of the mobilehome itself, using the N.A.D.A. Manufactured Housing Appraisal Guide or another recognized value guide, and then (2) assign the remainder of the purchase price to the interest in the park." (*Ibid.*)

The Assessor applied LTA No. 99/87's extraction method of appraisal in reassessing both Rancho Goleta and Silver Sands for the 2002–2003 tax year. In response, the corporations that owned these parks filed applications for changed assessment with Santa Barbara County Assessment Appeals Board No. 1 (Appeal Board). At the parties' request, the Appeal Board consolidated the hearing on these applications and then bifurcated the proceedings into two phases, with the

5

first focusing on questions of law and the second on the valuation of the parks. After conducting extensive hearings, the Appeal Board issued an opinion in the first phase resolving the issues of law adversely to the Assessor. It determined that the appraisal method set forth in LTA No. 99/87 was inconsistent with section 62.1(b). That statutory provision, the Appeal Board concluded, prescribed the following formula for appraising the portion of the park subject to reassessment: "Fractional Interest x FMV [Fair Market Value] of Entire Real Property of Park = FMV of Fractional Interest."

At the second phase, the parties presented evidence regarding the proper valuation of the parks. Both corporations submitted the reports of an expert appraiser, who concluded that Rancho Goleta's fair market value during 2001 was $13 million and that Silver Sands' fair market value ranged from $2.25 million to $ 3.4 million during 2001. The Assessor, in turn, submitted evidence that the two parks should be valued at approximately $39.8 million and $15.6 million, respectively. The Assessor arrived at these values through a so-called "market approach," which, like the extraction method described in LTA No. 99/87, subtracted the estimated market value of the mobilehome from the total purchase price paid for both the mobilehome and the interest in the entity owning the park, and then used that figure to calculate the value of the entire park.

In a second opinion, the Appeal Board rejected the appraisals submitted by the Assessor and instead used those submitted by the two corporations to calculate the value of the interests subject to reassessment. Finding that the Assessor's "market approach" was the "very same market approach model, but on a larger scale," that it had already rejected as inconsistent with section 62.1(b), the Appeal Board concluded that "[w]hat was invalid on a small scale does not become legitimate by its use on a much larger scale."

6

The Assessor filed a petition for a writ of mandate, which the Appeal Board and the corporations owning the two parks (collectively, respondents) opposed. After the trial court denied the petition, a divided Court of Appeal affirmed. The court concluded that while "[a]rguably, the Assessor presents a reasonable method for the taxation of changes in mobilehome ownership, . . . it is not the method set forth in section 62.1, subdivision [(b)]." Instead, the court found that the formula adopted by the Board "conforms to and embodies the plain meaning of the statute." It went on to reject the Assessor's various challenges to the Appeal Board's application of that formula. In dissent, Justice Yegan argued that the court had failed to give proper deference to the SBE and concluded that although section 62.1(b) "establishes the formula for determining what portion of a mobilehome park's real property is subject to separate assessment," the statute "is silent . . . on the method assessors are to use in determining the value of the membership interest."

## II.

The question presented is whether section 62.1(b) simply defines a unit of property that is deemed to change ownership for assessment purposes, or whether it also prescribes the manner in which that unit of property is to be appraised. Applying well-established rules of statutory construction, we conclude that the former interpretation is correct: Section 62.1(b) does not compel an assessor to appraise fractional interests in resident-owned mobilehome parks using the formula adopted by the Appeal Board.

Our goal in construing a statute is "to determine and give effect to the intent of the enacting legislative body." (*People v. Braxton* (2004) 34 Cal.4th 798, 810.) " 'We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be

7

construed in their statutory context.' [Citation.] If the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls." (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818.) If, however, the statute is susceptible to more than one interpretation, we "may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute. [Citation.]" (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1003.) Moreover, " ' "[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." [Citations.]' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 276.)

The text of section 62.1(b) offers little support for the Appeal Board's interpretation. As noted, the relevant statutes provide that if a mobilehome park has been transferred to certain resident-owned entities and has been excluded from reassessment pursuant to section 62.1, subdivision (a), "any transfer . . . of shares of the voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . shall be a change in ownership of a pro rata portion of the real property of the park." (§ 62.1(b)(1).) "For the purposes of this subdivision, 'pro rata portion of the real property' means the total real property of the mobilehome park multiplied by a fraction consisting of the number of shares of voting stock, or other ownership or membership interests, transferred divided by the total number of outstanding issued or unissued shares of voting stock of, or other ownership or membership interests in, the entity that acquired the park . . . ." (§ 62.1(b)(2).)

The meaning of this statutory language is clear: When a membership interest in a resident-owned entity that owns a mobilehome park is transferred, a fraction of the underlying real property will be deemed to have changed

8

ownership. Any contention that section 62.1(b) also identifies a method for appraising this fractional interest appears to rest on a misunderstanding of the term "pro rata." That term simply means "[p]roportionately; according to an exact rate, measure, or interest." (Black's Law Dict. (9th ed. 2009) p. 1340, col. 2; see Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 997 [defining "pro rata" as "proportionately, according to an exactly calculable factor"]; *Rosenberg v. Frank* (1881) 58 Cal. 387, 405 [providing various examples of the definition of the term "pro rata," including: " 'To divide or distribute proportionately; to assess *pro rata*,' " " 'according to a certain part, in proportion" and "(L. *according to the rate*) (com.) in proportion' "].) Although the term is often used to describe the distribution of a sum of money (see, e.g., *id.* at p. 406), its usage is not restricted to the division of money. In section 62.1(b), the interest that is being divided "proportionally" is "the real property of the park" (§ 62.1(b)(1)), and the rate (or proportion) according to which it is being divided is "the number of shares of voting stock, or other . . . membership interests, transferred divided by the total number of outstanding issued or unissued shares of voting stock of . . . or membership interests in, the entity that acquired the park" (§ 62.1(b)(2)). Thus, if there are 100 equal membership interests and one of these interests is transferred, then the "pro rata portion of the real property of the park" is simply 1/100 of the park.

Respondents, echoing a rationale adopted by the Court of Appeal below, contend that whereas the Appeal Board's formula for appraising these interests " 'gives meaning to the term <u>multiply</u> as used in Section 62.1[(b)](2)' . . . [,] the SBE's interpretation 'makes the term <u>multiply</u> completely meaningless since no multiplication occurs under the SBE's approach.' " But this argument presupposes that section 62.1(b) prescribes a method for *appraising* the pro rata portion of the park. In fact, section 62.1(b) says nothing about how to appraise

9

this interest.  It does not, for example, provide that the underlying real property interest must be appraised as a pro rata portion of the *total value* of the park.  It also does not make any reference to "full cash value" or "fair market value" of the total real property of the park.  Rather, the relevant "multiplication" contemplated by section 62.1(b) occurs simply in defining the interest to be valued:  The real property interest deemed to have changed ownership is the total real property of the park *multiplied* by the fractional interest in the entity owning the park that has been transferred.  In other words, the formula set forth in section 62.1(b) is not, as the Appeal Board concluded, "Fractional Interest x FMV of Entire Real Property of Park = FMV of Fractional Interest."  Rather, it is simply:  Fractional Interest (in Entity Owning the Park) x Entire Real Property of Park = Fractional Interest in Real Property of Park.  Section 62.1(b) is silent as to the method that must be used in appraising the interest defined by this formula.

To the extent that the statutory text leaves any room for alternative interpretations, legislative history supports the conclusion that section 62.1(b) simply defines a unit to be appraised and not a method of appraisal.  The Legislature's purpose in enacting this provision was to eliminate a potential loophole that had been discovered following the passage of the exemption codified in what is now section 62.1, subdivision (a).  Like the SBE analysis (see *ante*, at p. 2), an analysis prepared for the Assembly Committee on Revenue and Taxation explained:  "[I]f a park were purchased by a nonprofit mutual benefit corporation, it is possible that no part of the park would ever be appraised again.  Transfers of individual interest in a nonprofit corporation do[] not trigger a property reappraisal.  Thus, current law could allow mobilehome parks more favorable tax treatment than the average homeowner receives."  (Assem. Com. on Rev. & Taxation, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Aug. 1, 1988, p. 2.)

10

Section 62.1(b) eliminated this problem by defining an interest in the underlying real property itself that would be deemed to change ownership within the meaning of Proposition 13 when interests in the owning entity were transferred. There is no indication in the legislative history that section 62.1(b) was intended to do anything beyond what was necessary to close this loophole. The analysis for the Assembly Committee on Revenue and Taxation explained: "If the original stockholders (tenants) in the nonprofit organization transfer their stock or ownership interests in the park to a new owner, the transferred property will be subject to a change of ownership reappraisal. The new owner's pro rata portion of the real property of the park is considered a change of ownership for tax purposes." (Assem. Com. on Rev. & Taxation, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Aug. 1, 1988, pp. 1–2.) A similar analysis for the Assembly Ways and Means Committee explained that section 62.1(b) "provides that subsequent transfers of shares in the mobilehome park are changes of ownership for property tax purposes." (Legisl. Analyst, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Aug. 6, 1988, p. 1.) The fact that this provision was to be codified in section 62.1, in a subsection of the Revenue and Taxation Code that defines what will constitute a change of ownership triggering reassessment (see *Auerbach v. Assessment Appeals Bd. No. 1* (2006) 39 Cal.4th 153, 161), further confirms the understanding that section 62.1(b) merely defines a unit of property that is deemed to have changed ownership.

Respondents point to one snippet of the SBE's legislative bill analysis in arguing that the Legislature also intended to enact a particular method for valuing this interest. The SBE sponsored Senate Bill No. 1885 (1987–1988 Reg. Sess.), which contained what is now section 62.1(b). In an early legislative bill analysis, the SBE, after explaining the purpose of the provision and identifying how it accomplished this purpose, went on to offer the following comments: "This

11

amendment attempts to parallel as closely as possible the tax treatment accorded condominium and stock cooperatives. A perfect match is not possible, however, because the transfer of a share or membership interest in a nonprofit corporation is not the same thing as a transfer of ownership of a condominium or stock cooperative interest, which relates to specific identifiable property. Thus, rather than following the pattern prescribed in Section 65.1(b), which provides for reappraisal of the specific unit or lot transferred as well as a share of the common area, the amendment provides for a straight pro rate adjustment. [¶] *Thus, any differences in a value between mobilehome spaces in a particular park cannot be recognized under this method.*" (SBE, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Feb. 2, 1988, pp. 2–3, italics added.)

Other than the final, italicized sentence above, this explanation provides little support for respondents. The first three sentences of the excerpt quoted above explain that because an owner of a condominium has a formal, exclusive interest in specific identifiable property that a member of a nonprofit corporation does not, section 65.1, subdivision (b) identifies the interest in property to be reappraised when a condominium unit is sold as "the unit or lot transferred and the share in the common area reserved as an appurtenance," while section 62.1(b) identifies the comparable interest as "a pro rata portion of the real property of the park." It does not follow that a statute defining an interest in the latter fashion must also require a particular and distinct manner of appraising that interest.

The final, italicized sentence does indicate that the SBE contemplated a particular manner in which the interest defined by section 62.1(b) would be appraised and that all such interests would be valued equally. Notably, however, this italicized sentence was omitted from later versions of the SBE's bill analysis submitted to the Legislature. The omission occurred after the bill was amended to incorporate a provision requiring that an assessor provide a separate assessment of

12

"a pro rata portion of the real property of a mobilehome park" that has changed ownership if certain conditions are met (§ 2188.10, subd. (a)) — an amendment that perhaps prompted the SBE to reconsider how such interests may be appraised. In any event, the earlier version of the SBE's bill analysis on which respondents rely shows at most that the SBE might have believed, at one point in time, that the most appropriate way to assess these interests was the manner advocated by respondents here. It does not demonstrate that the SBE — or, for that matter, the Legislature — ultimately or ever believed that section 62.1(b) *compels* such a method of appraisal.

The Court of Appeal suggested that giving section 62.1(b) its plain meaning would produce absurd results by way of the following hypothetical, which was first set forth by the Appeal Board: " '[I]f 3 purchasers simultaneously paid $300,000 for a mobile home and an ownership interest in the park and they acquire spaces that are immediately adjacent to each other and that are identical for purposes of this example, and if the values of the mobile homes respectively vary from $75,000 to $125,000 to $175,000, the underlying values of the real property, the spaces, for tax assessment purposes would [under the Assessor's method] respectively vary from $225,000, $175,000 and $125,000.' . . . The Board's method of valuation, on the other hand, results in the same value being assigned to substantially similar properties . . . ." This hypothetical begs an obvious question: If the adjacent spaces are indeed identical, why would these three purchasers have paid the same amount in order to acquire mobilehomes whose values vary widely? These are not the sort of purchasing decisions one would expect to find in a well-functioning market. If each of these purchasers was in fact willing to pay the same amount for a mobilehome and the interest in the corporation, and if the mobilehome values were as varied as the hypothetical indicates, then the natural presumption would be that the sites associated with

13

those mobilehomes actually differed in value. There is nothing odd about the possibility that two equal fractional interests in property could be assessed at two different values for tax purposes. One 1/100 interest in a park could be appraised differently from another 1/100 interest in the same park, depending on its location, shape, available views, and possibly other factors. And if the market reveals that two equal fractional interests in property do not, in fact, have the same value, there is no reason to construe section 62.1(b) contrary to its plain meaning in order to eliminate such discrepancies.

A final reason for concluding that section 62.1(b) does not mandate the valuation formula adopted by the Appeal Board is that we owe a degree of deference to the SBE's interpretation of the statute, even though that interpretation is embodied only in an informal advice letter to the county assessors. (See *Auerbach v. Los Angeles County Assessment Appeals Bd.* (2008) 167 Cal.App.4th 1428, 1441 (*Auerbach*); *Watson Cogeneration Co. v. County of L.A.* (2002) 98 Cal.App.4th 1066, 1071, fn. 2.) "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts . . . ." (*Yamaha Corporation of America v. State Board of Equalization* (1998) 19 Cal.4th 1, 7 (*Yamaha*).) Such deference is warranted because "the agency will often be interpreting a statute within its administrative jurisdiction . . . [and] may possess special familiarity with satellite legal and regulatory issues." (*Id.* at p. 11.) The degree to which "judicial deference to an agency's interpretation is appropriate . . . is . . . fundamentally *situational*" and will depend on the extent to which the agency's expertise will provide it with a " 'comparative interpretative advantage over the courts' " and the degree to which it appears that the agency has carefully considered the issue. (*Id.* at p. 12; accord, *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140.)

The SBE undoubtedly has expertise in property tax matters. (See *Yamaha*, *supra*, 19 Cal.4th at p. 14; *Auerbach*, *supra*, 167 Cal.App.4th at p. 1441.) Moreover, the SBE might be expected to have particular familiarity with the provision at issue here because the SBE sponsored its passage. Respondents nevertheless contend that no deference to the SBE's understanding of section 62.1(b) is appropriate because its current interpretation of the statute is not longstanding and conflicts with its prior interpretation. (Cf. *Yamaha*, at p. 13 [" '[a] vacillating position . . . is entitled to no deference' "].) Respondents point to an earlier advice letter, circulated a month after the effective date of section 62.1(b), that did not explicitly recommend the extraction method of appraisal later set forth in LTA No. 99/87. (See Letter No. 89/13,Mobilehome Park Exclusion (Feb. 1, 1989) (LTA No. 89/13).) Again, however, respondents confuse the SBE's suggested method of appraisal for these real property interests with the SBE's interpretation of section 62.1(b) itself. Although LTA No. 89/13 did not recommend the extraction method of appraisal, it also did not state that such an approach was forbidden by section 62.1(b) or that section 62.1(b) established any particular method of appraisal. Rather, LTA No. 89/13 reflected the SBE's understanding that section 62.1(b) simply defined a unit of property subject to reassessment: "Upon the transfer of any ownership interest in the entity of either an originally issued share or an unissued share to a new participant, a change in the ownership of a pro rata portion of the real property of the park has taken place. A new base-year value is established for that portion of the real property." (LTA No. 89/13, p. 2.) Even if the SBE's understanding of how to appraise that unit of property has evolved as it has gained a greater understanding of the market in these interests, its interpretation of section 62.1(b) has not. The SBE's consistent interpretation further confirms our conclusion that section 62.1(b) does not mandate any particular appraisal formula.

15

The Appeal Board's decisions in this case were premised entirely on its contrary construction of section 62.1(b).  Because this interpretation was erroneous, the Appeal Board necessarily abused its discretion, and the Assessor's petition for a writ of administrative mandate should have been granted.  (See Code Civ. Proc., § 1094.5, subd. (b); *Merrill v. Department of Motor Vehicles* (1969) 71 Cal.2d 907, 923; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1061; *Natter v. Palm Desert Rent Review Com.* (1987) 190 Cal.App.3d 994, 1004.)  In reaching this conclusion, we make no judgment as to the proper means of appraising these property interests.  We hold only that the extraction method of appraisal is not foreclosed by section 62.1(b).

## CONCLUSION

For the reasons above, we hold that the Court of Appeal erred in concluding that section 62.1(b) establishes a particular formula for appraising the fraction of real property that is deemed to change ownership upon transfer of an interest in the resident-owned entity that owns a mobilehome park.  Accordingly, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

LIU, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
KENNARD, J.
CHIN, J.
CORRIGAN, J.
McINTYRE, J.*

---

\*      Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

**CONCURRING OPINION BY WERDEGAR, J.**

I concur in the majority's holding that Revenue and Taxation Code section 62.1, subdivision (b)**1** does not by its terms mandate use of the appraisal formula adopted in this case by the Santa Barbara County Assessment Appeals Board No. 1 (Appeals Board). I also concur, therefore, in the majority's direction to the lower courts that the Santa Barbara County Assessor's petition for administrative mandate should be granted (maj. opn., *ante*, at p. 16); that petition prayed only for reversal of the Appeals Board's decision and remand to that body for further proceedings consistent with California law. For reasons explained below, however, I greatly doubt the alternative appraisal formula recommended by the State Board of Equalization (SBE) and used by the assessor, the so-called "extraction" method (see maj. opn., *ante*, at p. 5), is consistent with either the language or the intent of section 62.1, subdivision (b).

Section 62.1, subdivision (b)(1) provides that the transfer of an individual share or membership interest in a mobilehome park owned by a nonprofit corporation or similar entity formed by park residents constitutes a change in ownership of "a pro rata portion of the real property of the park." Subdivision (b)(2) of the statute defines "pro rata portion of the real property" as "the total real property of the mobilehome park multiplied by a fraction consisting of the number

_____

**1**    All further statutory references are to the Revenue and Taxation Code.

1

of shares of voting stock, or other ownership or membership interests, transferred divided by the total number of outstanding issued or unissued shares of voting stock of, or other ownership or membership interests in, the entity that acquired the park."

As the majority observes, section 62.1, subdivision (b) defines the unit of real property that is subject to reassessment upon transfer of an individual share or membership in a nonsubdivided member-owned park; the statute's language does not itself prescribe a mandated appraisal method. (Maj. opn., *ante*, at p. 4.) But the statute's delineation of the property interest subject to reassessment is nonetheless important. The phrase "pro rata portion of the real property of the park" (§ 62.1, subd. (b)(1)) strongly suggests the unit to be appraised is an undivided portion of the park's property, that is, a fractional part of the entire property rather than any individual mobilehome space or any other geographically specific piece of the park's land. If any doubt existed on this point, the next paragraph (*id.*, subd. (b)(2)) makes it explicit by defining the pro rata portion as a fractional part of the whole, where the fraction is determined by dividing the number of shares or interests transferred by the total outstanding shares or interests.

The statute thus could not be clearer that the property unit subject to reassessment, and hence the unit that must be appraised, is an undivided fractional interest in the entirety rather than a specific physical portion of the park's land. In this respect, section 62.1, subdivision (b) differs crucially from the parallel provision for transfers of units or lots within condominium and similar subdivided complexes, which provides that the property to be appraised is "*the unit or lot transferred* and the share in the common area [appurtenant to] such unit or lot." (§ 65.1, subd. (b), italics added.)

2

The legislative history shows the Legislature was aware of this distinction and understood that under section 62.1, subdivision (b), the transfer of an individual membership interest in a nonsubdivided mobilehome park would not result in reassessment of the particular mobilehome space associated with the membership. As explained in a bill analysis written by the SBE, the provision that became section 62.1, subdivision (b) was intended to parallel the treatment of condominium and cooperative unit sales — but only up to a point. The parallel could not be exact because unlike in those sales, no particular space was being transferred in a membership sale: "A perfect match is not possible, however, because the transfer of a share or membership interest in a nonprofit corporation is not the same thing as a transfer of ownership of a condominium or stock cooperative interest, which relates to specific identifiable property. *Thus, rather than following the pattern prescribed in Section 65.1(b), which provides for reappraisal of the specific unit or lot transferred as well as a share of the common area, the amendment provides for a straight pro rata adjustment.*" (SBE, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) Feb. 2, 1988, pp. 2–3, italics added; see maj. opn., *ante*, at p. 12.)

When a share of a nonsubdivided mobilehome park is transferred, therefore, section 62.1, subdivision (b) mandates that an undivided pro rata portion of the entire park property, not any particular physical part of the park's land, be reassessed. The statute's premise, as the legislative history explains, is that sale of an interest in a nonsubdivided park does not transfer ownership of any individual unit or lot. Rather than reassess the individual mobilehome space, the assessor must therefore make what the bill analysis referred to as a "straight pro rata adjustment" to the assessed value. (SBE, analysis of Sen. Bill No. 1885 (1987–1988 Reg. Sess.) *supra*, at p. 3.) Whatever appraisal method is used, it must be aimed at valuing the undivided pro rata interest deemed to have been transferred

3

under section 62.1, subdivision (b), not a specific mobilehome space (even if one is associated by lease with the transferred share).

The SBE's extraction method does not appear to meet this criterion. According to the SBE advisory letter upon which the assessor in this case relied, the extraction method is premised on the view that the sale of a membership share transfers ownership of the associated space. Because "[t]he ownership of a fractional interest in the park represents exclusive ownership of *the individual underlying space*," the letter reasons, sale of a share or membership transfers "the exclusive right to occupy *a particular space* within the park." (SBE Letter No. 99/87, Individual Transfers in Resident-Owned Mobilehome Parks (Dec. 31, 1999) pp. 3-4 (LTA No. 99/98), italics added.) Under this view, it follows that "the appraisal unit is *the individual mobilehome space* and the mobilehome." (*Id.* at p. 4, italics added.) Ignoring the distinction it had made in the 1988 bill analysis, the SBE states in the 1999 advisory letter that under section 62.1, subdivision (b), transfers of shares in nonsubdivided parks are to be treated "on a par with" transfers of condominium and cooperative housing units. (LTA No. 99/98, *supra*, at p. 3.)[2]

Granted that section 62.1, subdivision (b) specifies only the property unit to be reassessed and does not mandate any particular appraisal method, the statute nonetheless appears to preclude the SBE's extraction method, because the latter *appraises the wrong unit of real property:* it seeks to value the particular mobilehome space rather than an undivided share of the park's total property.

---

[2]     As the Court of Appeal majority observed, "[i]f the Legislature had intended to treat resident-owned mobilehome parks in a manner similar to condominiums, stock cooperatives, and subdivided mobilehome parks, it could have amended section 65.1 to include them."

4

While section 62.1, subdivision (b) provides that the real property transferred by a membership share sale is an undivided "pro rata portion" of the park's real property, the SBE's 1999 advisory letter states the real property transferred, and hence the real property to be reassessed, is the "individual mobilehome space." (LTA No. 99/98, *supra*, at p. 4.)

The SBE's extraction method, in seeking to capture the market value of individual mobilehome spaces, may reflect market realities. But section 62.1, subdivision (b) is premised on an assumption seemingly inconsistent with the extraction method — that membership shares in park corporations, unlike condominium units, do not carry with them ownership of particular real property. Because, on this legislative view, no specific real property is transferred with sale of a park membership, the statute specifies the unit to be reassessed as an undivided pro rata portion of the whole rather than any individual mobilehome space. For this reason, I doubt the SBE's method may validly be applied to the properties at issue here.

I do not understand the majority to hold that the Appeals Board, on remand, must approve use of the SBE's extraction method or any similar appraisal method. I therefore concur in the judgment of the majority.


WERDEGAR, J.

5

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Holland v. Assessment Appeals Board No. 1

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 208 Cal.app.4th 1412
**Rehearing Granted**

_____

**Opinion No.** S205876
**Date Filed:** January 23, 2014

_____

**Court:** Superior
**County:** Santa Barbara
**Judge:** James W. Brown

_____

**Counsel:**

Dennis A Marshall, County Counsel, and Marie A. LaSala, Deputy County Counsel, for Plaintiff and Appellant.

Douglas W. Walker, Kevin L. Morris; Nicholas S. Chrisos, County Counsel (Orange), James Clement Harman, Deputy County Counsel (Orange); Glenn Beloian; Sandeep Mitra; Walter Joseph DeLorrell III; James B. Rooney for California Assessors' Association, Dennis Draeger, San Bernardino County Assessor, Webster J. Guillory, Orange County Assessor, Larry Ward, Riverside County Assessor, Lawrence E. Stone, Santa Clara County Assessor, and Ernest J. Dronenburg, Jr., San Diego County Assessor, as Amici Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Kathleen Kenealy, Chief Assistant Attorney General, Susan Duncan Lee, Acting Solicitor General, Paul D. Gifford, Assistant Attorney General, W. Dean Freeman, Felix E. Leatherwood and Stephen Lew, Deputy Attorneys General, for State Board of Equalization as Amicus Curiae on behalf of Plaintiff and Appellant.

Dennis A. Marshall, County Counsel, and Jerry F. Czuleger, Deputy County Counsel, for Defendant and Respondent.

David C. Fainer, Jr., for Real Parties in Interest and Respondents.

The Gibbs Law Firm, Gerald R. Gibbs and David L. Gibbs for The Associates Group for Affordable Housing, Inc., Palm Beach Park Association, Inc., and Summerland by the Sea, Inc., as Amici Curiae on behalf of Real Parties in Interest and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Marie A. LaSala
Deputy County Counsel
105 E. Anapamu Street, Suite 201
Santa Barbara, CA 93101
(805) 568-2950

James Clement Harman
Deputy County Counsel
333 West Santa Ana Boulevard
Santa Ana, CA 92702-1379
(714) 834-5257

Jerry F. Czuleger
Deputy County Counsel
105 E. Anapamu Street, Suite 201
Santa Barbara, CA 93101
(805) 568-2950

David C. Fainer, Jr.
1114 State Street, Suite 200
Santa Barbara, CA 93101
(805) 899-1300